IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ARCO MANAGEMENT CORP., Plaintiff, | ) | |
| v. | ) | No. 04-1782C |
| UNITED STATES, Defendant. | ) | (Judge Firestone) |

JOINT PRELIMINARY STATUS REPORT

Pursuant to the Appendix A of the Rules of the Court of Federal Claims ("RCFC"), plaintiff, Arco Management Corp. ("Arco"), and the defendant, the United States, respectfully submit this Joint Preliminary Status Report ("JPSR").

**4.A. Does the court have jurisdiction over the action?**

The parties are not presently aware of anything that would prohibit the Court from exercising jurisdiction over certain matters alleged in the complaint as having occurred prior to the expiration of the contract. It is our understanding that jurisdiction over such matters exists pursuant to section 609 of the Contract Disputes Act, 41 U.S.C. § 601, et seq. ("CDA"), and the Tucker Act, 28 U.S.C. § 1491(a).

However, certain claims in the complaint concern alleged Government actions and inaction after the contract had expired. E.g., complaint, ¶¶ 48-71. The United States contends that these claims fail to state a claim for breach of contract, and that the Court does not otherwise possess jurisdiction to consider these claims.

**B. Should the case be consolidated with any other case and the reasons therefore?**

No.

**C. Should trial of liability and damages be bifurcated, and the reasons therefore?**

No.

**D. Should further proceedings in this case be deferred pending consideration of another case before this court or any other tribunal and the reasons therefore?**

No.

**E. In cases other than tax refund actions, will a remand or suspension be sought and the reasons therefore and the proposed duration?**

No.

**F. Will additional parties be joined and, if so, a statement describing such parties, their relationship to the case, and the efforts to effect joinder and the schedule proposed to effect joinder?**

No.

**G. Does either party intend to file a motion pursuant to RCFC 12(b), 12(c) or 56, and, if so, a schedule for the intended filing?**

No.

**H. What are the relevant issues?**

The parties respectfully submit the following separate statements of relevant factual and legal issues.

Statement by ARCO

**Fact Issues**:

In 1997, Arco, a real estate property management company, entered into Contract No. C-HOU-00021 ("the Contract") with Defendant, acting through the U.S. Department of Housing and Urban Development ("HUD"), to furnish "the necessary services, materials, equipment, supplies, facilities, professional and technical personnel, and all else necessary" to manage housing projects assigned to Arco in the eastern 21 states, Puerto Rico and the U.S Virgin Islands.

Under Modification 17, also known as Task Order ATL-T0070 ("the Task Order"), the Contract was "modified to include specifics regarding [Arco's] management of defaulted, occupied New York City properties insured under HUD's 203(k) program" ("the HUD properties"), effective June 13, 2001. Under its 203(k) program, HUD insures mortgage loans to encourage lenders to make loans available to borrowers who would not otherwise qualify for conventional loans on affordable terms.

The scope of work under the Task Order was very different from that under the original Contract. Among other things, under the Task Order Arco advanced funds to its subcontractors and then

sought reimbursement from HUD. Under the original Contract, HUD paid Arco's subcontractors directly. Arco's management fee under the Task Order was only $75 per month per unit. In essence, Arco accepted the Task Order as an accommodation for HUD.

The HUD properties consisted of approximately 150 multifamily buildings in the five boroughs of New York City and Long Island. Most of the buildings were located in the Bedford-Stuyvesant, Brownsville and East New York sections of Brooklyn and the Harlem section of Manhattan.

Most of the buildings were three-story brownstones that had been built before 1950. The buildings contained up to six units. Many of the buildings had been abused and neglected for years and were in a state of substantial disrepair, collectively suffering from many hundreds of building code violations, at the time Arco began to manage them.

Pursuant to the Contract, Arco managed its subcontractors and performed other managerial services for the HUD properties. As directed by Arco, and pursuant to the Contract, Arco's subcontractors performed extensive mechanical, electrical, plumbing, boiler, carpentry, drywall, plastering, painting, locksmith, debris removal, cleanup and other services for the HUD properties, often on an emergency basis. Pursuant to the Contract, Arco submitted invoices to HUD for services performed.

In 2001 and through most of 2002, the parties' performance

under the Contract went relatively smoothly. However, in or about November 2002, the U.S. General Accounting Office ("GAO") made HUD aware that GAO was investigating HUD's management of its programs, including its 203(k) program. This investigation had nothing to do with Arco's performance under the Contract or the Task Order. At the same time the GAO was investigating HUD's management activities, HUD began withholding payments owed to Arco, including payments for invoices seeking reimbursement of amounts Arco had already paid its subcontractors. GAO issued a report in January 2003 that criticized HUD's management of its 203(k) program and other programs.

As the months passed in 2003, HUD continued to withhold most of the payments owed to Arco, including reimbursement of amounts that Arco had already advanced to its subcontractors on behalf of HUD. However, HUD expected Arco to continue to perform services, and Arco did so. Due to HUD's conduct, Arco was not able to pay some amounts owed to its subcontractors, some of which began to refuse to do further work on the HUD properties.

On October 23, 2003, the parties executed Modification 004 under which they agreed to terminate the Task Order upon the following terms:

a. Effective October 31, 2003, Arco would no longer have management responsibilities for the HUD properties.

b. Arco would submit "all outstanding reimbursable

bills" to HUD by November 28, 2003 and "waive any claim for any reimbursable expenses not submitted" by that date.

c. The parties promised to "cooperate with each other and to devote whatever reasonable effort is necessary during the period leading up to November 28, 2003 to close out all the open reimbursable invoice matters."

d. HUD agreed to "review and accept or challenge" in writing each invoice received and, for each invoice challenged, to identify reasons for the challenge. The parties agreed that "[i]f no reason for challenge is identified, then the invoice will be presumed proper for payment."

e. The parties would meet to review the challenged invoices.

f. If any unresolved invoice issues remained after the above meeting, Arco's President and HUD's Contracting Officer would meet to try to resolve them.

g. If the parties still could not resolve invoice issues, they would submit them to a "neutral third party for some manner of non-binding mediation, arbitration, or alternative dispute resolution."

In accordance with Modification 004, Arco submitted invoices totaling $330,409.50 to HUD representing Arco's and its subcontractors' charges for services performed through October 31, 2003. HUD challenged almost all of the invoices submitted by

Arco. However, HUD failed to identify, in writing, specific reasons for almost all of its challenges.

Pursuant to Modification 004, Arco requested a meeting between its President and HUD's Contracting Officer so that they could attempt to resolve the invoice issues, but HUD refused to agree to such meeting. Also, pursuant to Modification 004, Arco requested that the parties submit the invoice issues to a neutral third party for non-binding mediation, arbitration or alternative dispute resolution, but HUD refused to agree to such submission.

Pursuant to Modification 004, the parties had agreed that Arco's management responsibilities for the HUD properties would end on October 31, 2003. However, HUD failed to take actions to ensure that Arco's management responsibilities would in fact end on that date.

In particular, despite repeated requests from Arco, HUD failed to take timely or proper action regarding certain New York City authorities, which assessed fines or penalties against Arco related to the buildings. During Arco's performance of the Task Order, certain New York City governmental authorities, including without limitation the City of New York Department of Finance, the City of New York Department of Housing Preservation and Development and the New York City Department of Health and Mental Hygiene ("the New York City authorities"), held Arco accountable as the managing entity responsible for the HUD properties. HUD

was aware of this situation at all times.

The delay in actually ending Arco's management responsibilities occurred because the New York City authorities would only accept HUD's own notification that Arco was no longer the managing entity responsible for the HUD properties, but HUD delayed in doing so. Arco notified the New York City authorities that it was no longer the managing entity for such properties, but they refused to accept Arco's notification. HUD failed to take timely or proper action to change the managing entity information with the New York City authorities, notwithstanding repeated requests by Arco that it do so.

As a result of HUD's failure to notify the New York City authorities that Arco was no longer the managing entity responsible for the HUD properties, after October 31, 2003 those authorities continued to hold Arco accountable for such properties by, among other things, charging it with building code violations for such properties and imposing penalties on Arco.

Arco repeatedly notified HUD that its failure to notify the New York City authorities that Arco was longer the managing entity responsible for the HUD properties was forcing Arco to perform additional management services and incur additional expenses and liabilities beyond the scope and period of the Contract or the Task Order. Arco's additional management services protected HUD's interests in the HUD properties. Arco

repeatedly notified HUD that Arco would charge HUD for the additional management services, expenses and liabilities. (Finally, in March 2005, HUD sent counsel for Arco copies of two letters dated March 17, 2005, one addressed to the New York City Division of Code Enforcement and the other to the Division of Anti-Abandonment, in which HUD states that Arco is no longer managing the HUD properties.)

In June 2004, Arco submitted its Final Request for Payment to HUD in the amount of $415,505.30, seeking payment of $330,409.50 for subcontractor invoices and $85,095.80 for management fees charged and expenses unavoidably incurred by Arco after October 31, 2003 (as well as for reimbursement of amounts paid to a certain subcontractor for services provided before October 31, 2003). By a letter dated July 21, 2004, Arco certified its Final Request for Payment as a claim in the amount of $413,955.30, plus interest. By a letter dated September 17, 2004, the Contracting Officer issued a final decision denying Arco's certified claim.

**Legal Issues**:

1. Did HUD's failures to pay the invoices Arco submitted for services performed by its subcontractors, to comply with the dispute resolution procedures set forth in Modification 004, and to notify the New York City authorities that Arco was no longer responsible for managing the HUD properties after October 31,

2003 constitute breaches of contract for which Arco should recover?

2. Did HUD's failure to notify the New York City authorities that Arco was no longer responsible for managing the HUD properties after October 31, 2003 constitute a breach of the implied covenant of good faith and fair dealing?

3. By failing to notify the New York City authorities that Arco was no longer responsible for managing the HUD properties after October 31, 2003, did Defendant actually or constructively change the Contract and assume liability for the management fees charged and expenses incurred by Arco after that date?

Statement by the United States

**Factual Issues**

1. Did Arco perform the work identified on various disputed invoices?

2. Did Arco comply with contractual requirements to promptly document work performed, and promptly document related inspections, in connection with various disputed invoices?

3. Do the amounts sought on various disputed invoices accurately reflect charges permitted by the contract?

4. Is the credibility of Arco management affected by the fact that Arco forwarded for payment, and later withdrew, invoices submitted by a person convicted for misdeeds in connection with related business activities?

**Legal Issues**

1. Can Arco establish liability for any amounts invoiced on the various disputed invoices?

2. Assuming Arco can establish some liability related to various disputed invoices, what is the amount of damages?

3. Does the Court possess jurisdiction to consider Arco's claim based upon events that occurred after the contract had expired?

4. Assuming that the Court possesses jurisdiction to consider Arco's claim based upon events that occurred after the contract had expired, did the United States act reasonably and in good faith by notifying the New York City authorities that Arco was no longer managing relevant properties?

5. Assuming that the Court possesses jurisdiction, and that the Court finds the United States is liable for some claim based upon events that occurred after the contract had expired, what damages, if any, were a direct and foreseeable result of the actions of the United States?

**I. What is the likelihood of settlement? Is alternative dispute resolution contemplated?**

Settlement has been discussed, and those discussions continue. In furtherance of such discussions, Arco has voluntarily produced to the United States over 1,200 pages of invoices, work orders and other documents that the United States

informally requested, as well as spreadsheets showing Arco's responses to HUD concerns with respect to the invoices at issue.

The parties do not presently contemplate alternative dispute resolution proceedings.

**J. Do the parties anticipate proceeding to trial? Does any party or do the parties jointly request expedited trial scheduling?**

Trial is likely if settlement discussions are not successful. The parties agree that expedited trial scheduling would not be in the interests of justice or judicial economy.

**K. Are There Special Issues Regarding Electronic Case Management Needs?**

No.

**L. Is there any other information of which the court should be aware at this time?**

No.

**5. Proposed Discovery Plan**

1. Fact discovery should be completed by May 15, 2007. All requests pursuant to RCFC 31, 33, 34 and 36 served after April 15, 2007 shall be deemed untimely.

2. The party with the burden of proof regarding an issue shall disclose its testifying experts, the information required by RCFC 26(a)(2), and all expert reports by June 15, 2007.

3. All rebuttal experts, required information, and expert

reports shall be disclosed by August 1, 2007.

4. All expert discovery shall be completed by September 1, 2007.

5. Summary judgment motions, if any, shall be filed by October 1, 2007.

6. A status conference shall be held on or about October 15, 2007 to discuss the status of the case, and to establish any necessary pretrial schedule.

Respectfully submitted,

/S Kenneth S. Nankin
KENNETH S. NANKIN
Nankin & Verma PLLC
888 Seventeenth Street, NW
Suite 700
Washington, DC 20006
Tele: (202) 463-4911
Fax: (202) 463-6177

Attorney for Plaintiff

July 7, 2005

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

/S Mark A. Melnick
MARK A. MELNICK
Assistant Director

/S James W. Poirier
JAMES W. POIRIER
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St, N.W
Washington, D.C. 20530
Tele: (202) 307-6289
Fax: (202) 514-7969

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on July 7, 2006, a copy of the foregoing "JOINT PRELIMINARY STATUS REPORT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

S/ James W. Poirier